UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION - DETROIT

IN RE :

JOHN ANDREW JACKSON, and
JULIE RUTH JACKSON
    Debtors.
_____/

Chapter 7
Case No. 13-43032
Hon. Walter Shapero

DENGENSHA AMERICA CORP.
    Plaintiff,

v.

JOHN A. JACKSON
    Defendant.
_____/

Adv. Pro. 13-04540

## OPINION DENYING NON-DISCHARGEABILITY AND PERSONAL LIABILITY

### INTRODUCTION

Dengensha America Corp. ("Plaintiff" or "Dengensha") filed this adversary proceeding against the Debtor, John A. Jackson ("Defendant") to determine dischargeability of a debt pursuant to 11 U.S.C. §523(a)(2)(A) and Defendant's personal liability for that debt. The Court concludes the subject debt is dischargeable and in any event is not a personal obligation of Defendant.

### BACKGROUND

At all relevant times, Defendant was the sole shareholder and president of Summit Automation Inc. ("Summit"). As such, he was in charge of its business affairs, including handling its finances. He was also the sole check signer at Summit with the exception of his wife on rare occasions. Summit, among other things, manufactured machinery and equipment

1

involved in producing automobile parts. In early June, 2011, Summit entered into an agreement with Plaintiff, by way of Summit issuing a written purchase order to Plaintiff (the "Dengensha contract"). Plaintiff is an Ohio Corporation engaged in the business of supplying resistance welding equipment. The Dengensha contract generally obligated Summit to purchase from Plaintiff, several machines called "feeders" for the total sum of $355,782.00. That contract initially required Summit to pay 50% of the purchase price at the time the order was placed (which in fact was done). The remaining 50% was to be paid (a) 30% at the time the feeders were shipped, and (b) the balance thirty days after final shipping. The evidence further indicates it was initially contemplated that all of the feeders would be shipped at the same time. However, as the time passed, it became the understanding (as testified to by the uncontradicted testimony of Plaintiff's President and CEO) that (a) there would be four shipments: (b) the 30% portion of the remaining 50% of the total contract price would be broken down and calculated in relation to each of the four shipments; (c) the amounts appropriate to each shipment would be paid at the time of shipment; and (d) the remaining 20% of the total purchase price would be paid thirty (30) days after the last shipment.

The feeders covered by the Dengensha contract were to be incorporated by Summit into some sort of assembly or production line, or equipment that Summit was under contract (the "Magna contract") to manufacture and deliver to Magna International Inc., or one of the latter's subsidiaries ("Magna"). A comparison and timeline between, and the history of, the manufacturing, delivery, payment requirements and actual payments (or non-payment) history under both contracts is relevant to a full understanding of the situation. The record supports the following with reference to such:

(A) <u>The Dengensha contract</u>:

    June 1, 2011: Dengensha issues its purchase order to Summit, for $355,762; 50% or $177,883 was actually paid then; balance to be paid: $106,728 (30%) at time(s) of delivery; and & $71,152 (final 20%) 30 days after final delivery.

    October 21, 2011: First delivery of feeders by Dengensha to Summit; The contract required an additional partial payment at time of delivery; no such payment was made.

    November 18, 2011: Second delivery of feeders by Dengensha to Summit; The contract required an additional partial payment at time of delivery; no such payment was made.

    November 22, 2011: Third delivery of feeders by Dengensha to Summit; The contract required an additional partial payment at time of delivery; no such payment was made.

    January, 2012: Dengensha attempted to deliver the fourth and final shipment of feeders, but delivery was not effected or accepted because Summit had ceased operating; The contract required final payment 30 days after final delivery of all feeders; No such payment was made.

(B) <u>The Magna contract</u>:

    February, 2011: Summit starts working on Magna contract, without receiving formal purchase orders in order to meet deadlines.

    May, 2011 through June, 2011: Summit receives purchase orders from Magna.

    August, 2011: Summit issues invoices to Magna for 85% of work required under its contract with Magna.

    September, 2011: Magna pays the August, 2011 invoices.

    September, 2011: Summit asks for extra costs because of claimed Magna delays and changes; Magna promises Summit a new large contract incident to which Summit was induced to provide advance engineering etc. work; Magna refuses Summit's requests to pay extra costs on the existing contract.

    October, 2011: Summit submits additional and final invoices on the existing contract to Magna for some $620,582.

    November 16, 2011: Summit requests payment of its invoice balances from Magna; Magna says it will pay the October invoices by December 15, 2011; Magna again made new work representations to Summit.

> Magna did not pay anything further, except for some direct payments to some Summit subcontractors; Amounts claimed by Summit to be owed to it by Magna were $620,582 for October 2011 invoices; plus $277,943 for change order work; plus $780,815 for delay, extra labor and material costs.
>
> November, 2012: Summit's attorneys prepare proposed lawsuit against Magna.

The foregoing, as it relates to Summit's contract with Magna, is derived primarily from allegations in a proposed Complaint prepared for filing by the attorneys for Summit when indicated. Those allegations were generally corroborated by a witness for Summit. That case was not filed however, due apparently to Summit's perceived inability to prosecute and finance lengthy and potentially very costly litigation with Magna.

On or about January 31, 2012, Plaintiff filed an action against Summit only in the Cuyahoga County, Ohio Court of Common Pleas. A default judgment in that case was eventually entered on June 5, 2012, against Summit in the sum of $170,853.00.

Defendant and his wife filed for Chapter 7 Bankruptcy protection on or about February 19, 2013. In this timely initiated adversary proceeding, Plaintiff claims that the judgment debt is non-dischargeable pursuant to 11 U.S.C. §523(a)(2)(A), and that Defendant is personally liable for that judgment. The relevant issues to be considered at trial were set forth in this Court's Opinion Denying Defendant's Motion for Summary Judgment, a certain part of which at page 3 is worth repeating here and accurately defines what is before the Court, to wit:

> Plaintiff has specified that it is relying only on the false pretenses provision. "'False pretenses' for purposes of Section 523(a)(2)(A) then may be defined as conscious deceptive or misleading conduct calculated to obtain, or deprive another of, property. It is the practice of any scam, scheme, subterfuge, artifice, deceit or chicane in the accomplishment of an unlawful objective." *Rakich v. Jagiello*, 2013 WL 4068166 at *7 (Bankr. E.D. Mich. 2013) (quoting *In re Kovler*, 249 B.R. 238, 261 (Bankr. S.D. N.Y. 2000)). It requires a showing of reliance, materiality, and intent. *In re Hermoyian*, 466 B.R. 348, 379 (Bankr. E.D. Mich. 2012). "A false pretense has been defined to include a 'mute charade,'

where the Debtor's conduct is designed to convey an impression without oral representation." Id. at 377 (quoting *Schafer v. Rapp (In re Rapp)*, 375 B.R. 421, 433 (Bankr. S.D. Ohio 2007)).

As that opinion also noted, what is essentially involved here is a claim of false pretenses by way of promissory fraud i.e., a promise of performance (in this case, payment for delivered items) made, when at the time the promisor (Summit) had no intention of performing that promise. In this case, as previously noted, that is claimed to have been true both (a) at the time the Dengensha contract was initially entered into in early June, 2011, and (b) when Summit later accepted an initial delivery of feeders in late October, 2011 and, subsequently, two other deliveries of feeders on different dates in late November, 2011.

## GOVERNING LAW

Dengensha initially argued in this case that there was an implied representation by Summit, either at the time of the entry into the Dengensha contract, or at the various times of its acceptance of the deliveries of the feeders, that Summit was either solvent or was not then insolvent. The Court specifically dealt with that issue in its Opinion Denying Defendant's Motion for Summary Judgment. The Court there essentially opined that a representation or statement as to solvency or insolvency is one respecting a Debtor's financial condition, and as such is only actionable if it is in writing, as is required by §523(a)(2)(A) and (B). That would also be true even if it was affirmatively made, or as argued here, simply implied. No claim is made here that there was any such writing, nor can it be made there was the equivalent of such. Therefore this case is to be decided within the framework of §523(a)(2)(A), which provides:

> A discharge under section 727, 1141, 1228 (a), 1228 (b), or 1328 (b) of this title does not discharge an individual Debtor from any debt— for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by— false pretenses, a false representation, or actual fraud, other than a statement respecting the Debtor's or an insider's financial condition[.]"

5

To prevail under this section, the Plaintiff must prove, by a preponderance of the evidence, that the Defendant, (1) made a representation, (2) that the Defendant knew at the time was false, (3) that the Defendant made the representation deliberately and intentionally with the intention and purpose of deceiving the Plaintiff, (4) that the Plaintiff justifiably relied on the representation, and (5) that the Plaintiff sustained damages as a proximate result of the representation. *Rembert v. AT&T Universal Card Services, Inc. (In re Rembert)*, 141 F.3d 277, 281 (6th Cir. 1998); *Longo v. McLaren (In re McLaren)*, 3 F.3d 958, 961 (6th Cir. 1993); *Willens v. Bones (In re Bones)*, 395 B.R. 407, 431 (Bankr. E.D. Mich. 2008). This Court and other Courts interpret the term "statement" to also encompass a failure to disclose important facts where there exists a duty to disclose such. *See In re Jacobs*, 460 B.R. 149, 157-58 (Bankr. E.D. Mich. 2011).

A Plaintiff proceeding under §523(a)(2)(A) must demonstrate that the Defendant subjectively intended to deceive the Plaintiff. *See In re Rembert*, 141 F.3d at 281, and, "Intent to deceive may be inferred from a 'reckless disregard for the truth or falsity of a statement combined with the sheer magnitude of the resultant misrepresentation.'" *In re Wood*, 458 B.R. 898, 902 (E.D. Mich. 2011), quoting, *In re Copeland*, 291 B.R. 740, 786 (Bankr. E.D. Tenn. 2003); *see also In re Finch,* 289 B.R. 638, 643 (Bankr. D. Ohio 2003). Put somewhat differently, intent to deceive may be "inferred as a matter of fact" based on the totality of the circumstances by examining the Defendant's conduct to determine if it presented the Plaintiff with "a picture of deceptive conduct ... indicat[ing] an intent to deceive." *Wolf v. McGuire (In re McGuire),* 284 B.R. 481, 492 (Bankr. D. Colo. 2002).

ANALYSIS

The Dengensha contract contained an obligation to pay the sums due at the times indicated.[1] That already existing promise to pay arising from the contract was not repeated when the subsequent deliveries were actually made, and need not have been. Nor would it have made any difference if those same promises were then repeated. The existing, or even repeated, promises to pay were nothing more than that, particularly when considered in the context of the other evidence in the case as to the non-specific general practices in the industry relative to when payments incident to delivery are required. There was no provision in the Dengensha contract or any inference that might be drawn that payment was required to be made at the exact point and time of actual delivery i.e. these were not contractually or otherwise COD transactions.

In any event, for purposes of this proceeding, the legal analysis is the same whether applied at the time of the formation of the contract initially or at the times of the various deliveries i.e. (as noted, there were no affirmative or implied representations made other than the promises to pay arising from the contract itself). Standing alone, and while a representation of sorts, without the additional required proof (among other requirements) that at the time the promisor never intended to make good on that promise, such is not successfully actionable under §523(a)(2)(A). Given the following analysis, even if one could somehow find some other actionable representations, Plaintiff would nevertheless not prevail.

*A. Intent To Deceive*

The mere inability to repay a debt at the time it is incurred is not, in and of itself actionable under §523(a)(2)(A). This is true because inability to pay at a given time is generally the reason why a party buys on credit. *In re Rembert*, 141 F.3d at 281. An intent not to pay, (i.e. a then held

---

[1] The purchase order payment language was "Payment Terms: 50% at time of order, 30% at time of shipment, 20% net 30 days after shipping".

subjective intent not to do so) is to be determined by the totality of the circumstances. It has been described as being "extremely difficult to establish." *Id*. at 282. One of the many factors involved in determining that subjective intent is the debtor's financial condition at the time the charges were made. *Id*. "We believe that 'the representation made by the cardholder in a credit card transaction is not that he has an ability to repay the debt; it is that he has an intention to repay.'" *Id*. at 281 (citing *Anastas v. American Savings Bank,* 94 F.3d 1280, 1287 (9th Cir.1996)). "To measure a debtor's intention to repay by her ability to do so, without more, would be contrary to one of the main reasons consumers use credit cards: because they often lack the ability to pay in full at the time they desire credit." *In re Rembert*, 141 F.3d at 281.

There was indeed substantial evidence submitted at trial relating to Summit's financial condition or solvency at the time it entered into the Dengensha contract, and/or at the times of deliveries. Insolvency at these times, while not dispositive, is a relevant factor to consider when evaluating the totality of the circumstances and in particularity when determining the existence of an intent to pay or not pay. Plaintiff asserts that Summit was insolvent at the time it initially issued the purchase order. Plaintiff's expert witness Jason Bogniard ("Bogniard") produced a solvency opinion relating to the solvency of Summit. Bogniard also discussed this opinion in his video deposition which was presented at trial. Bogniard's opinion examined Summit's financial condition by studying Summit's federal income tax returns, profit and loss statements, and balance sheets. Bogniard preformed three separate tests in his opinion relating to the solvency of Summit. The first test Bogniard preformed was referred to as the "balance sheet test." This test compared Summit's assets with its liabilities. The "balance sheet test" according to Bogniard states that if a corporation's liabilities exceed its assets, then the corporation is insolvent. This test was performed on Summit for the years 2010 and 2011. According to the "balance sheet

test," at the end of 2010, Summit had an adjusted net asset value of approximately negative $1,780,000. This essentially means that Summit had $1,780,000 more in liabilities than it did in assets. At the end of 2011, the test showed that Summit had an adjusted net asset value of approximately negative $1,610,000. The second test Bogniard conducted on Summit was called the "capital adequacy test." The "capital adequacy test," according to Bogniard, "seeks to determine whether a Debtor has adequate capital resources with which to continue operations by meeting operating expenses, recurring debt obligations and necessary capital expenditures." Bogniard's opinion based on the "capital adequacy test" was that no outside party would invest in Summit due to its insolvency. The third and final test performed by Bogniard was the "cash flow test." The "cash flow test" sought to determine whether Summit had sufficient cash flow to pay its debts as they became due. It was Bogniard's opinion that Summit was insolvent in 2011 based on the "cash flow test" as well. The evidence and testimony presented relating to the financial condition of Summit reflects that Summit was in fact experiencing some financial difficulties at the time it entered into the Dengensha contract.

Defendant alleged that the methods Bogniard used to determine Summit's solvency are better suited for analyzing the value of a company for sale or requesting a line of credit. Defendant also argued that Bogniard should have analyzed internal company accounting records as opposed to simply analyzing the IRS income tax returns. Finally, Defendant points out that Bogniard's analysis failed to consider unlisted receivables, including the large receivable from Magna.

There was also evidence submitted to support Defendant's position that Summit was anticipating an influx of new work from the Magna contract, which could potentially earn Summit substantial profits in the near future. Defendant also testified that Summit was also

9

approached by a paint company to manufacture a paint sample machine. Summit received a requirements contract from the paint company providing that Summit would be the exclusive build source of the machine worldwide. Defendant testified that based on this requirements contract alone, he anticipated Summit would be making approximately four million dollars of profit per year. In sum, the evidence regarding insolvency is mixed and not definitive, and in any event not dispositive.

In addition to evidence relating to the financial condition of Summit at the time it entered into the Dengensha contract, Plaintiff also presented evidence at trial that Defendant signed a personal guaranty of Summit's loan with Crestmark Bank ("Crestmark"). This guaranty was signed on July 19, 2007. Plaintiff asserts that because Summit made payments to Crestmark during the time Summit was experiencing financial difficulties, this fact should lead the Court to infer that Defendant preferred to reduce his personal liability on the Crestmark guarantee, rather than paying Plaintiff, and thus intended to deceive the Plaintiff. Plaintiff is attempting to show that Defendant obtained credit from Plaintiff with the intention of using the credit to pay off Crestmark. Without more, the evidence on the record cannot support this inference. Defendant very well could have decided to pay Crestmark as opposed to Plaintiff because he was personally liable for the debt to Crestmark. This fact is either irrelevant, or carries relatively little weight, however, because the issue here is primarily whether Defendant intended to deceive the Plaintiff at the time Summit entered into the Dengensha contract. It relates to Defendant's conduct in winding up Summit's business and does not weigh materially in favor of a finding that Defendant had a subjective intent to defraud at an earlier date in time. The evidence that Defendant submitted relating to the Magna contract and the projected future profits Summit

would generate outweighs any inference that Defendant obtained credit from Plaintiff on Summit's behalf with an intent to deceive Plaintiff.

Finally, Plaintiff also submitted evidence that Defendant paid himself a salary exceeding $210,000.00 for the year 2011, and that Defendant gave himself what was referred to on Summit's 2011 income tax return as a "loan" for $87,000. Defendant testified at trial that this "loan" amount was misclassified. Defendant testified that $24,000 of this amount was Summit's tax liability which Defendant paid. Defendant also testified that $21,000 of the amount classified as a "loan" was used as a deposit to purchase the building that Summit was renting at the time. Eventually, the deal to purchase the building was not completed and the $21,000 was paid as a substitute for the final month's rent. Finally, Defendant testified that the remaining approximately $40,000 was for overdue payroll from 2010 owed to himself. Defendant claimed that he paid himself the additional $40,000 because Summit was anticipating a one million dollar profit for the end of the year and that Summit was not short on cash at the time he paid himself the overdue payroll. While the fact that Defendant distributed to himself essentially over $250,000 for the year of 2011 is somewhat troubling, it is not sufficient to outweigh the other facts from which the Court concludes that Summit did not intend to defraud Plaintiff. Defendant was not unreasonably anticipating that Summit would become profitable and was working towards achieving that goal. Defendant made good faith efforts to secure valuable work for the corporation and was successful in obtaining contracts that appeared profitable. Even if this salary was excessive, there is no evidence, and no inference can be drawn, that it was paid with the intention of siphoning assets out of the corporation and into the hands of Defendant personally to deprive Summit of the means to pay its debt under the Dengensha contract (keeping in mind that

personally siphoning or decreasing Summit's assets works to, among other things, increase Defendant's liability on his personal guaranty of Summit's debt to Crestmark).

Additionally, Defendant testified at trial that Summit had been growing somewhat rapidly in the time leading up to the Dengensha contract. Defendant testified that Summit moved from a 13,000 square foot building into an 80,000 square foot building. Defendant further testified that Summit was introduced to Magna through Ford and this relationship caused its gross sales to grow from approximately three million dollars to twelve million dollars in only one year, due in part to the fact that many smaller auto suppliers went out of business during 2008-2009. Defendant testified in regards to the Magna breach that Summit had already incurred the costs associated with completing its own performance on the contract, and that Magna's breach was unexpected. These facts are important to take into account when considering that even if Summit was then insolvent, it was expanding and was reasonably thought in good faith to have potential to become profitable.

Also, while Summit was experiencing financial difficulties during the latter part of 2011, Defendant sought to obtain new financing. Defendant submitted evidence of an indication of interest in a proposed loan for Summit dated October 20, 2011. Defendant also formed a new business entity known as Summit Automation LLC, in an attempt to bring in equity investors. These capital contributions could possibly have allowed Summit to continue operating its business even after Magna breached the Magna contract.

The conclusions the Court draws from all of the foregoing facts relating to the insolvency claim as it bears on the basic issue are:

(1) By certain, but not all tests, Summit may have been insolvent at the time the Dengensha contract was entered into, and/or at the times of deliveries;

(2) The tests Bogniard performed did not adequately take into account the facts that (a) Summit had previously started working on a large order from Magna and was already working on it and in the process of creating a large receivable; (b) after the Dengensha contract was signed and Summit began working on it, Summit issued large invoices to Magna in August and was paid 85% of such in September; (c) In September and prior to any deliveries by Dengensha, Magna apparently agreed to pay the balances of its invoices in December; (d) the amounts involved were more than enough, if received by Summit to pay what it owed to Dengensha; and (e) there were indications from existing and potential customers of Summit of additional business for Summit.

(3) To the extent there may have existed insolvency, the non-payment of the balances due to Dengensha by Summit at the times contractually required, was primarily due to the payment and contract issues Summit contemporaneously experienced with Magna, and the latter's failure to pay Summit the amounts it claimed.

When these facts are taken into consideration, either (a) the alleged insolvency in the sense that it should be used or defined for the purposes of this case, and its bearing on intent, did not exist, or (b) if it did, it is of insufficient weight to permit a conclusion that Summit did not intend at any of the relevant times to pay for the feeders. To the contrary, the totality of the facts on balance tends to indicate that Summit had every intention of doing so, certainly when the contract was initially entered into and also, at all pertinent times. To conclude otherwise under the facts in this case would move dangerously and inappropriately close to an inappropriate finding that a mere breach of contract in the presence alone of arguable insolvency is sufficient to prove a case under §523(a)(2)(a).

Appropriate to the facts of this case is the following:

A finding that a debt is non-dischargeable under 523(a)(2)(A) requires a showing of actual or positive fraud, not merely fraud, not merely fraud implied by law…While we recognize that a view of the Debtor's overall financial condition is a necessary part of inferring whether or not the Debtor incurred the debt maliciously and in bad faith,… the hopeless state of a Debtor's financial condition should never become a substitute for an actual finding of bad faith.

*In re Rembert*, 141 F.3d at 281 (quoting *Anastas v. American Savings Bank,* 94 F.3d 1280, 1286 (9th Cir.1996)).

### B. *Justifiable Reliance*

Justifiable reliance, a required element of proof, has been defined as "an intermediate level of reliance." *Fields v. Mans*, 516 U.S. 59, 74 (1995). Whether reliance is justifiable is based on the Plaintiff's own capacity, its knowledge, and its sophistication. *In re Bones*, 395 B.R. at 431-432. In the context of promissory fraud, a minimum amount of initial diligence by the Plaintiff regarding the ability to pay is required to show justifiable reliance even as to future transactions. *See In re Rembert*, 141 F.3d at 284.

Defendant argues the lack of justifiable reliance because, Plaintiff did not ask Summit about its financial condition primarily at the time it entered into the Dengensha contract (or the times of delivery). Plaintiff says it took other measures to show how or why it justifiably relied on Summit's promise to pay for the feeders. As Plaintiff had never previously conducted business with Summit, Plaintiff obtained a Dun & Bradstreet report to help gain insight on Summit's credit worthiness. At the conclusion of its investigation, Plaintiff apparently determined that Summit might be somewhat of a credit risk, justifying requiring Summit to pay half the price of the feeders in advance. Plaintiff's witness Don Grisez ("Grisez") testified that doing so was unusual in the trade. What Dengensha in fact "relied" on in addition to that report was what it knew or was aware of regarding the reputation or general information about Summit available commercially, and it was the sum of that which formed the basis for establishing the relationship. So what we have here is (1) a somewhat limited investigation of Summit before entering into the contract that was directed to any concerns Plaintiff might have had about dealing with Summit; (2) Plaintiff's acceptance of a simple uncomplicated purchase order from Summit, the nature and contents of which belied any real concerns about Summit performing under it: and (3) the requirement of an unusual 50% in advance down payment. Consequently, it

is clear to this Court that other than the simple promise to pay made by Summit, what Plaintiff actually and primarily, if not exclusively, relied on was the satisfactory to it result of its own investigation of the credit and financial situation of Summit and acceptability to it of the agreed upon contract terms, which included a large down payment meant specifically to reduce the credit risks involved. That simply is not the stuff of justifiable reliance in the context of a §523(a)(2)(A) cause of action. It would be inappropriate and not legally supportable to turn such a course of dealing in hindsight into some sort of actionable §523 fraudulent transaction. What it essentially all boils down to in this proceeding is that the Plaintiff engaged in a not unusual business transaction and took (and partially hedged) a not abnormal commercial risk. In the recited circumstances it would not be appropriate based on the facts and the law in a proceeding such as this, to use or countenance such being used as a vehicle to turn it into anything other than that.

## C. Defendant's Personal Liability for the Debt

The conclusion that the debt here involved is dischargeable under §523 would seem to render unnecessary opining on the issue of this individual Debtor's asserted personal liability for that corporate debt. However, the parties raised and discussed that issue, which would become relevant if the Court's conclusion on dischargeability is somehow not sustained. Therefore, the Court feels appropriate to deal with it.

On the personal liability issue, the relevant and applicable law is:

(A) When corporate officers individually engage in what has been variously described as intentional tortious and/or criminal acts, they can be held personally responsible regardless of whether they were acting on their own behalf or on behalf of the corporation. *See Dep't of Agric. v. Appletree Mktg., L.L.C.*, 485 Mich. 1 (2010); *Olympic Forest Products, Ltd. v. Cooper*, 148 F. App'x 260, 263 (6th Cir. 2005); *Attorney Gen. v. Ankersen*, 148 Mich. App. 524 (1986).

(B) When considering whether "tortious" conduct is involved, one must consider the distinction between tort and breach of contract, and thereby understand that a tortious act requires a breach of duty separate and distinct from the breach of contract; or, put differently, tortious conduct for purposes of personal liability must not only arise from breach of a duty separate and apart from the breach of contract itself, but involve active negligence or misfeasance. *See Victory Lane Quick Oil Change, Inc. v. Hoss*, 659 F. Supp. 2d 829 (E.D. Mich. 2009); *Sudden Serv., Inc. v. Brockman Forklifts, Inc.*, 647 F. Supp. 2d 811 (E.D. Mich. 2008); *Spengler v. ADT Sec. Servs., Inc.*, 505 F.3d 456, 457-58 (6th Cir. 2007).

The totality of the recited facts leading to the Court's dischargeability conclusion also preclude a conclusion that Defendant engaged in the kind of conduct that could reasonably be characterized as being considered intentionally tortious or as otherwise affording a legal basis for personal liability. His conduct did not amount to a separately actionable wrong, and one cannot point to any duty on his part to Plaintiff or otherwise, that was separate and apart from the payment or other provisions of the Dengensha contract. Nor can one find in those facts any personally actionable active negligence or misfeasance on the part of Defendant.

## CONCLUSION

For the reasons stated, the Court concludes that (1) Plaintiff has failed to meet its burden of proof with regard to its claim pursuant to 11 U.S.C. §523(a)(2)(A) and (2) Defendant in any event, has no personal liability for the debt involved. Defendant shall present an appropriate order.

**Signed on February 09, 2015**

                                          **/s/ Walter Shapero**
                                        **Walter Shapero**
                                        **United States Bankruptcy Judge**